# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00360-COA

**NICOLE WILLIAMS**                                                                     **APPELLANT**

**v.**

**ESTELLA WILLIAMS**                                                                      **APPELLEE**

DATE OF JUDGMENT:            02/22/2023
TRIAL JUDGE:                         HON. VICKI R. BARNES
COURT FROM WHICH APPEALED:   WARREN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     LINDSEY OSWALT WATSON
ATTORNEY FOR APPELLEE:      MICHAEL R. BONNER
NATURE OF THE CASE:         CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                AFFIRMED - 06/18/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Nicole Williams appeals the Warren County Chancery Court's dismissal of her petition for a constructive trust regarding property owned by her mother, Estella Williams. The petition for a constructive trust arose out of an alleged agreement between Nicole and Estella that if Nicole invested a sum of money into repairing Estella's home, then Estella would convey title to the house to Nicole.  Aggrieved by the chancery court's denial,  Nicole raises the following issues: (1) whether the chancery court erred in concluding that no confidential relationship existed between Estella and Nicole; (2) whether the chancery court erred in finding that Nicole failed to prove Estella made a promise to convey her house; and (3) whether it is equitable to allow Estella to retain the entire value of the home and Nicole's

investment in the home without any equitable relief. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Nicole had lived in her mother Estella's home since 1997. The home was titled solely in Estella's name.[1] In 2003, Nicole filed a disability claim based on injuries she suffered in a car crash, for which she received a cash settlement in 2008.[2] Nicole claims that she invested some of the money she received from the settlement into making improvements to her mother's home based on an agreement that Estella would eventually convey the home to her. However, in 2016 Estella and Nicole argued, and Estella left the home to stay with her other daughter Estella ("Precious") Mayfield. Eventually, Estella filed an action to evict Nicole from the home in August of 2019.

¶3.     Upon receiving notice of the eviction proceeding, Nicole filed her petition alleging that Estella promised to "convey the subject property to the Plaintiff provided she put on a new roof, make other repairs and maintain to the premises, purchase appliances, paint the premises, and pay the utilities." Nicole alleged that she did all these things, but Estella refused to convey the property. Nicole requested that the court impose a constructive trust and compel Estella to transfer title to the property to Nicole. In the alternative, she requested that the court award her damages in the amount of $15,000 plus attorney's fees and that a lien

---

[1] In 1998 when Estella's husband died, all eleven children received a share of her husband's interest in the house. Thereafter, all the children, including Nicole, conveyed their interest in the house to Estella, so that she alone would own a fee simple interest in the property.

[2] At some points the parties in their brief refer to the settlement being in the amount of $15,000, but the testimony shows that the amount was actually between $26,000 and $29,000.

2

be placed on the subject property.  The constructive-trust case was tried on October 6, 2022, with the following testimony given.

*Nicole Williams*

¶4.    Nicole testified that she is the youngest of Estella's eleven children, and she has lived in the subject home since before her father died.  At various points, Nicole lived elsewhere, but she ultimately moved back into the home with her two children, Clay (who had lived in the home for some time) and Nicholas (who had lived in the home for his entire life).  Following the disbursement of the cash settlement from her car accident, Nicole and Estella agreed that if Nicole invested some of her settlement proceeds into the house then Estella would allow Nicole to stay in the house and would convey title to the house to Nicole.

¶5.    In describing the agreement between herself and her mother regarding the house, Nicole said the following:

> You know, she said that she was going to will me the house.  We had talked about it.  I said, "Well, okay."  You know, I knew what needed fixing, and it was no problem to go fix them because I knew I could live there.  We were family.  I didn't think anything differently than that.

However, Nicole later said the following on rebuttal:

> I believed what she said, that she was going to deed me the house, and I was going to live there.  She was going to deed the property to me.  As far as the will that she's saying, I never read it.  I didn't see it, and I didn't go there with her. So I don't know what she's talking about.  The way I took it was, that at some point she would sign it over to me because she didn't want my sister to try to take it from me.

Thus, Nicole's testimony was inconsistent as to whether Estella promised to convey the

3

house during Estella's lifetime, or if Estella promised to devise the house to Nicole by will.[3]

¶6.　　Nicole stated that when Estella was still living in the home with her, she would do various things for her mother, such as handling her doctor visits, taking her to doctor's appointments, managing her medication, fixing her food, and anything else she needed. When asked why she did these things for Estella, Nicole said, "Because she's my mother. You know, she helped me; I helped her. That was how we were together. I mean, we were family." When asked whether she considered the alleged agreement between herself and Estella to be a bargain, Nicole said she did not consider it a bargain but emphasized that "we were family . . . . I get what you're asking me, but it's kind of hard to, you know, separate all of that, because, I mean, we lived as a unit. If she fell short on something, I would help her. If I fell short on something, she would help me."

¶7.　　Nicole testified to and produced receipts showing the expenditures she made in buying materials to repair the home. These expenses included $4,482.55 in materials and services and between $3,500 and $4,000 in cash to pay a roofer, totaling roughly $8,500.[4] Nicole also

---

[3] There was no written agreement between Nicole and Estella, nor was any will for Estella ever produced.

[4] These receipts include payments for the following: $839.92 to Cowboy Maloney's for an electric range/stove; $1,649.00 to McCoy's Building Supply for roofing materials; $325.00 for American Disposal Services roll-off container service; $909.50 for Ricky's Welding & Machine Shop; another $599.30 to McCoy's Building Supply for miscellaneous materials; $193.43 to Home Depot for a home air purifier; $12.50 to Home Depot for miscellaneous tools; $488.99 to McCoy's Building Supply for more roofing materials. The totals for these receipts add up to $5,017.64. However, the "Tape Report" produced as Exhibit 11 for Nicole shows a total of $4,482.55 in materials and services. Nicole testified that she did not have receipts for the cash payment to the roofer.

produced photographs that reflected the condition of the home before and after her repairs.[5] Nicole stated that Estella had asked her to remodel the kitchen with Estella purchasing the flooring and picking the color for the walls and with Nicole installing the flooring and painting. Nicole also claimed to have paid to have a new dishwasher installed, though no receipt was produced. A photograph showed a spot on the outer wall of the house where the bricks were separating from the structure. Nicole stated that she paid her brother to install a steel beam to support the structure and replace the bricks. Another photograph showed a metal awning that had been damaged in a hail storm, for which Nicole hired a welding company to repair. Other photographs showed a bathroom where Nicole claimed to have replaced the plumbing for the bathtub and retiled the floors. Nicole also produced a photograph of Estella's bedroom, where Nicole claimed to have redone the molding and painted the walls. Nicole stated that she paid half the cost to cut down a tree that had roots growing under the foundation of the house, splitting the cost with a neighbor. Nicole also produced a photo of a gap in the foundation where she claimed she poured new concrete to shore up the structure and prevent water from getting under the house. Nicole identified a photo of a storage shed she claimed to have built. Lastly, Nicole produced photos of the roof, for which she claimed she paid to have the shingles replaced, although she paid in cash and did not have a receipt for the roofer's labor.

¶8. When Estella was living in the home, Nicole claimed to have paid for the majority of the groceries for the house, primarily from her supplemental disability income. Nicole also

---

[5] All these photos are in black-and-white, and it is difficult to make out the details. The descriptions provided for each photo are taken directly from Nicole's testimony.

testified that she helped pay some of the utilities with cash, though Estella always wrote the checks. Nicole stated that this continued even after Estella left the home because some of the bills were still in Estella's name. Eventually, however, some of the services were turned off, and she had to reconnect them in her name. Nicole stated that the water for the house was still shut off, and that she had to get water pumped to the house from the neighboring vacant lot (with permission from the owner) because she could not reconnect the water services in her name. Nicole claimed that as of the day of trial, she was still assisting her mother with medical issues, such as ordering her diabetes tests every three months.

¶9.    Nicole testified that at some point in 2016, she and her mother had a "falling out," but Nicole maintained that she did not force or scare Estella out of the home. Nicole stated that she never terminated the agreement with her mother concerning the conveyance of the home and that she did not become aware of her mother's intention to no longer convey the home until Nicole received the first eviction notice in April 2019. Nicole did not leave the home when she received the eviction notice, and she did not have any conversation with Estella regarding the eviction or the home. Nicole was still living in the home at the time of the instant proceeding.

¶10.    When asked how she believed Estella was unjustly enriched, Nicole said that "when she decided to leave the home and decided to put me out, it seems like . . . she didn't have any intention on keeping the agreement or whatever you want to call it[.] She didn't have any intention on following through with that, what we had always talked about[.]"

*Lucille Williams*

6

¶11. Lucille Williams is the fifth eldest child of Estella Williams. Lucille testified that she remained estranged from her mother after Estella made it clear that choosing to maintain a relationship with Nicole meant Lucille was "taking Nicole's side" rather than Estella's side. Lucille stated that she knew that Nicole and Estella had entered into an agreement following Nicole's settlement. Lucille said that Estella had told her, "[Y]ou have a place to live, and Nicole doesn't have . . . her own place. So, she had been, you know, helping out with the house and everything. So, I'm going to leave the house to Nicole." When asked what "leave the house to Nicole" meant to her, Lucille said that she thought it meant that when Estella died, Nicole would get the house, but in the meantime Nicole would invest her money into the home to make it livable. Lucille also testified that she was aware that the roof was leaking based on spots on the ceiling when Hurricane Katrina came through, and she recalled that Nicole tarred the roof to prevent the leaking, which was how she originally hurt herself and why she sought disability income.[6] Lucille also confirmed that Nicole had repaired or replaced certain items or fixtures, such as the roof, vents on the roof, the awning, door frames, painting, flooring, and plumbing.

¶12. Lucille said that once Nicole and Nicholas sought a permanent restraining order against Clay for alleged abuse, Estella left the home and moved in with Precious. There was never any discussion as to why Estella left the house.[7]

---

[6] The record is absent of an explanation of whether this disability was affected by or related to the cash settlement Nicole received.

[7] Lucille speculated that Estella wanted to continue having Clay visit the home, but Estella knew that could not happen with Nicholas in the home. Lucille said that in 2018, it appeared to her that Estella had given the house to Nicole and "moved on" because Estella

*Clay Farrell*

¶13.    Clay Farrell is Nicole's eldest son.  He lived with Nicole, Estella, and Nicholas until 2016.  Clay testified that he was living in the home when the roof was installed in "maybe 2005, maybe 2007."  He said that the roof had nothing wrong with it, just that it was older. He specifically said the roof was not leaking when it rained.  Clay said that Estella was not afraid of him, but she was afraid of Nicholas.  Clay said that there were problems between himself and Nicholas.  Clay said that he heard Estella and Nicole argue about money and that Estella was afraid of Nicole.  Clay said that after Estella left the home in 2016, she stayed with Precious.  In 2019, he took Estella to the courthouse to help her file an  eviction action. Clay did not testify about any alleged agreement between Nicole and Estella to convey the property to Nicole.

*Estella "Precious" Mayfield*

¶14.    Precious, another daughter of Estella, said that her mother Estella has lived with her since 2016.  Precious said that Estella left the subject home because Nicole was taking advantage of her.  Precious testified about a time in 2016 when Nicole and Estella got into a dispute regarding Nicholas and Clay.  She said that after this dispute, Estella went to the hospital for high blood pressure.  Following Estella's discharge from the hospital, she went home with Precious, though she returned to the subject home at various points to collect her belongings.

*Estella Williams*

had moved into Precious's house taking all of Estella's furniture.

8

¶15. At the time of trial, Estella was ninety-three years old and had been living with Precious for five years. She had previously lived at the subject home for roughly forty years. Estella testified and admitted that she said she would leave the house to Nicole when she passed away, but Estella denied having any sort of arrangement with Nicole for her to do certain things in exchange for Estella leaving Nicole the house. Estella agreed that she, Nicole, Clay, and Nicholas lived together as a family. Estella claimed that, despite her age, she could have lived by herself without Nicole.

¶16. Estella agreed that she and Nicole split the bills and groceries, and she and Nicole would both cook. Estella admitted that Nicole took her to her doctor's appointments because she could not drive anymore. Estella denied Nicole's involvement with her medications, and she said that Precious was the one who ordered her diabetes testing supplies every three months.

¶17. Estella claimed that the new roof was Nicole's idea, but she had agreed on things like fixing the floor and bought the materials to do so.[8] Estella admitted that Nicole purchased the electric range/stove and that Nicole purchased the roofing supplies, but Estella denied asking Nicole to install a new roof and claimed that the old roof was not leaking. She also denied any knowledge of Nicole tarring the roof after Hurricane Katrina. Estella claimed to

---

[8] At various points, Estella stated that Nicole completed some work, but later Estella contradicted herself, saying that Nicole never did that specific work. For instance, Estella claimed that she purchased the flooring for the kitchen and living room, but Nicole installed it. Estella later said, however, that Nicole only installed the living room flooring and that Precious hired somebody to install the kitchen flooring. Regarding painting, Estella testified that she purchased the paint and Nicole painted the house. Just a few moments later, however, she said that Nicole did not paint the house or must have done so after she left.

9

have purchased the pipes that Nicole replaced in the bathroom. Despite these claims that she purchased the materials, however, Estella did not produce any receipts to that effect.

¶18. Estella said that one day, when Nicole was taking her to the emergency room for her high blood pressure, Estella asked Nicole, "[H]ow come you talk to them doctors like you do?" At this point, Estella said that Nicole got angry and said:

> I ain't got to fool with you. . . . I ain't going to do so and so for you no more. I ain't going to do this, and I ain't cooking no more. I ain't going to carry you to the store, and I ain't carrying you over to Jackson no more, and I ain't going to take you to the eye doctor no more.

Estella also said that Nicole told her that she hated her. Estella said that this shocked her, and after Nicole left to take care of the boys at home, she told the nurses at the hospital not to let Nicole back in her room. She said she was afraid of Nicole because she had never talked to her like that before.[9]

¶19. After being discharged from the hospital, Estella said that Precious took her to her home, and Estella stayed there ever since. However, after two years, Estella said she wanted to go back to her home. She told this to Clay and Precious, and they took her to justice court. There she filed papers to have Nicole evicted because Estella did not want to live with Nicole any longer based on what was said at the hospital. Estella emphasized that she did not agree to transfer title to the house to Nicole but, rather, that she had devised her interest in the property to Nicole, who would take the title when Estella died

¶20. On February 22, 2023, after considering the evidence presented by both parties, the

---

[9] On rebuttal, Nicole told her side of the story regarding the hospital incident, saying that she was the one actually frustrated with the way Estella spoke to the doctors.

chancery court found no confidential relationship but, instead, simply a mother/daughter relationship. The court further found that Nicole had not satisfied the elements of a constructive trust by failing to produce sufficient evidence of her reliance on Estella's alleged promise. Lastly, the court found that Estella engaged in no wrongful conduct. Thus, the court refused to impose a constructive trust and dismissed the complaint with prejudice.

¶21. Nicole appealed from this order of dismissal, arguing that the court erred in finding that (1) no confidential relationship existed; (2) a promise is necessary to impose a constructive trust; and (3) no constructive trust was justified.

## STANDARD OF REVIEW

¶22. "[T]his Court's review of a chancellor's findings of fact, including those regarding a constructive trust, is limited in that this Court cannot set aside a chancellor's findings of fact so long as they are supported by substantial credible evidence." *McNeil v. Hester*, 753 So. 2d 1057, 1064 (¶26) (Miss. 2000). "However, this Court conducts a de novo review of questions of law, including those regarding the applicability of a constructive trust." *Id*. As such, we will not disturb the chancellor's findings unless they were manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard. *In re Est. of Hood*, 955 So. 2d 943, 946 (¶7) (Miss. Ct. App. 2007).

## DISCUSSION

¶23. "A constructive trust is a judicially imposed remedy used to prevent unjust enrichment when one party wrongfully retains title to property." *White v. White*, 325 So. 3d 666, 671-72 (¶20) (Miss. Ct. App. 2020) (citing *Presbytery of St. Andrew v. First Presbyterian Church*

11

*PCUSA of Starkville*, 240 So. 3d 399, 405 (¶27) (Miss. 2018)). We have quoted the Supreme Court's holding that this type of trust "is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another." *Id*. (quoting *McNeil*, 753 So. 2d at 1064 (¶24)). There are several ways to establish a constructive trust, including but not limited to: (1) fraud; (2) duress; (3) abuse of confidence; (4) commission of a wrong; or (5) any form of unconscionable conduct, artifice, concealment or questionable means. *McNeil*, 753 So. 2d at 1064 (¶24). "Clear and convincing proof is necessary to establish a constructive trust." *Id*. at (¶25).

¶24. A constructive trust can be fashioned under the abuse of confidence theory through a showing that (1) the parties were in a confidential relationship, and (2) the confidential relationship was abused. *Id*. Such abuse can be shown either by the breach of a promise upon which the confiding party relied, *In re Est. of Horrigan*, 757 So. 2d 165, 171 (¶27) (Miss. 1999), or by undue influence by one party over another. *Madden v. Rhodes*, 626 So. 2d 608, 617 (Miss. 1993).

¶25. However, there is also a catch-all theory under which a constructive trust can also be fashioned. Indeed, a constructive trust may be imposed in any situation where one person "holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *McNeil*, 753 So. 2d at 1064 (¶24). To impose a constructive trust under this catch-all theory, a person must show that failure to impose a constructive trust would result in unjust enrichment. *Id*. It is important to note that there is no requirement that a

confidential relationship be established for a constructive trust to be imposed based on the catch-all of being "against equity and good conscience." *Joel v. Joel*, 43 So. 3d 424, 431 (¶23) (Miss. 2010) (finding that despite no abuse of confidence, the trial court was not in error for ordering a constructive trust when failing to do so would violate equity and good conscience). Nicole argues that a constructive trust should be imposed under the theory of abuse of confidence or, alternatively, under the catch-all theory of being against equity and good conscience.

## I. Whether a constructive trust should be imposed based on the theory of an abuse of confidence.

¶26. Our supreme court has stated "[i]t is the [confidential] relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." *Id*. at (¶25) (quoting *Davidson v. Davidson*, 667 So. 2d 616, 620 (Miss. 1995)). Thus, we first turn to the question of whether Nicole and Estella could be considered to be in a confidential relationship under the law.

### A. Whether there was a confidential relationship.

¶27. "Confidential relationships" may be informal, domestic, or personal, and the phrase is construed "liberally in favor of the confider. . . ." *McNeil*, 753 So. 2d at 1065 (¶28); *Russell v. Douglas*, 243 Miss. 497, 138 So. 2d 730, 733 (1962). Based on this liberal view, Nicole argues that she and her mother were in a confidential relationship, not simply a familial one like the chancery court characterized it.

¶28. While a familial relationship can rise to the level of a confidential relationship for the purposes of establishing a constructive trust, it "is not intrinsically one of confidence."

13

*McNeil*, 753 So. 2d at 1065 (¶28). This Court has cautioned that trial courts should be "careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships." *White*, 325 So. 3d at 672 (¶23) (quoting *McNeil*, 753 So. 2d at 1064 (¶25)). However, the high burden of proving a confidential relationship rests on the party seeking to establish one. *Id.* In the present case, the chancery court found, based on the evidence produced at trial, that Nicole and Estella were not in a confidential relationship but, rather, just a familial one. Substantial credible evidence supports the findings, and we agree with the holding.

¶29. Nicole testified that she and her mother lived together for almost all of Nicole's life, that Estella helped raise Nicole's children, that they split the bills, and that Nicole helped Estella with her medical needs, such as getting her prescriptions, taking her to the doctor, and dealing with medical bills. Lucille corroborated much of this testimony, describing Nicole and Estella's relationship as one in which Nicole took care of Estella, and Estella provided a home and financial stability to Nicole and her children. Estella disagreed with some of Nicole's testimony, maintaining that she did not need Nicole to take care of her and challenging the degree of Nicole's contributions to the household. However, Estella agreed for the most part that Nicole contributed to the bills and upkeep of the home and that Nicole invested at least some of her settlement money into the home.[10]

---

[10] There are major disagreements regarding what caused Estella's departure from the home. While Nicole contends that she believes Estella left the home because Nicole pressed charges against Clay for the years of alleged abuse to Nicholas, Estella contends that she left because of Nicole's behavior at the hospital. Regardless of what caused Estella's departure, all these alleged events appear to have occurred after Estella's alleged promise to convey the title and Nicole's investment of money into the house. Therefore, these events did not affect

14

¶30. While our caselaw is clear that trial courts should not limit confidential relationships to fiduciary relationships or guardianships, it is up to the trier-of-fact to weigh the evidence and determine if the relationship is one that rises above familial and into the realm of confidence. *McNeil*, 753 So. 2d at 1064 (¶26). Indeed, as the burden was stated many years ago, the "proof must establish the facts and circumstances giving rise to the trust with an extraordinary degree of certainty and clarity." *Lipe v. Souther*, 224 Miss. 473, 80 So. 2d 471, 483 (1955). Upon review of the facts presented at trial, Nicole failed to prove "with an extraordinary degree of certainty and clarity" that she and Estella were in a confidential relationship. Nicole testified that she and her mother both contributed to the bills and upkeep of the home. However, this amounted to little more than a mutually dependent relationship, with both parties paying bills, cooking, cleaning, and investing in the maintenance and upkeep of the home. While Nicole stated that Estella relied on her to make medical appointments and drive her around, Nicole did not explain how she confided in Estella to such a degree that their relationship was elevated from a familial one to a confidential one.[11] Thus, Nicole failed to prove by clear and convincing evidence the existence of a confidential relationship, and therefore the chancery court's finding was not manifestly wrong, clearly erroneous, or based on an erroneous legal standard.

---

the character of Nicole and Estella's relationship at the time in which the pertinent events surrounding the alleged constructive trust occurred.

[11] In *McNeil*, while the supreme court did not make a ruling as to whether a familial relationship between a father and his co-executors rose to the level of confidence, the supreme court did note the independence of the parties as a significant detail in its analysis. *McNeil*, 753 So. 2d at 1065 (¶28).

15

### B. *Whether there was an abuse of the confidential relationship.*

¶31.    Even if we were to find that Nicole and Estella's relationship rose to the level of a confidential relationship, we would still find that there was no abuse of that relationship, either by undue influence or through the breach of a promise by Estella. *Est. of Horrigan*, 757 So. 2d at 171 (¶26).    Nicole argues that Estella abused their alleged confidential relationship by breaking her promise to convey the house during Estella's lifetime. However, the record does not show by clear and convincing evidence that Estella promised to deed the property to Nicole rather than leave it to her in Estella's will or that she broke such a promise.

¶32.    At trial, Nicole testified during her direct examination that "[Estella] said these things need fixing.  You know, she said that she was going to *will* me the house."  (Emphasis added).  However, later on rebuttal, Nicole testified that Estella "was going to *deed* me the house," and "she would *sign it over* to me because she didn't want my sister to try to take it from me."  (Emphasis added).  Thus, Nicole's direct testimony was not consistent with her rebuttal testimony.  She admitted that Estella said she was going to "will" her the house on direct, but she claimed that she believed Estella was going to "deed" or "sign it over" to her on rebuttal.  In other words, Nicole first testified Estella would devise the property to Nicole in her (Estella's) last will and testament, but Nicole later testified that Estella had agreed to transfer the deed during her lifetime (i.e., sooner, rather than later).

¶33.    Estella, however, consistently stated that she never intended to convey the house to Nicole during Estella's life but, rather, that she intended to leave the house to her in her will.

16

Estella also said that devising the house to Nicole by will was not contingent upon Nicole doing any repairs. Thus, Estella's testimony was consistent with regard to her intent to make a testamentary devise of the house to Nicole, rather than by deeding it inter vivos.

¶34. Lucille was the only other witness who testified about the details of Estella's alleged promise to devise or convey the house to Nicole. Lucille testified that Estella told her, "I'm going to leave the house to Nicole" and that this meant, "[I]n the end, she'll get the house. When I pass, you'll get the house." Lucille also said that Estella told her, "[Nicole] had been, you know, helping out with the house and everything. So, I'm going to leave the house to Nicole." Lucille further reiterated that "[Estella] said she would leave the house to Nicole, because Nicole had helped, you know, fix up the house[.]" Thus, Lucille, despite being called as a witness for Nicole, corroborated Estella's testimony as to Estella's promise concerning the transfer of the home.

¶35. Based on this testimony, there may have been sufficient evidence to establish that there was some promise between Estella and Nicole that if Nicole were to invest her settlement proceeds into the house, then Estella would leave the house to Nicole *in her will*. However, there was insufficient evidence that Estella ever promised to transfer the house to Nicole *during her lifetime*. Thus, the chancellor's finding that Nicole failed to prove by clear and convincing evidence that Estella promised to convey the house to Nicole during Estella's lifetime was not manifest error or clearly erroneous, nor was the ruling based on an incorrect legal standard. *McNeil*, 753 So. 2d at 1064 (¶26).

¶36. For all the above reasons, we find that there was neither sufficient evidence to show

17

a confidential relationship between Nicole and Estella, nor was there sufficient evidence to show that Estella promised to convey the home to Nicole during her lifetime or that Estella broke such a promise or agreement. Therefore, we find that the chancery court was correct in refusing to impose a constructive trust based on an abuse of confidence.

## II. Whether Estella would be unjustly enriched by the court's refusal to impose a constructive trust based on equity and good conscience.

¶37. Nicole also argues that even absent a confidential relationship and abuse of confidence, the circuit court should have imposed a constructive trust based on equity and good conscious because Estella was unjustly enriched by Nicole's investment in the home. In response, Estella argues that Nicole was the one who was unjustly enriched because she lived rent-free in the home for years at the low cost of roughly $5,000 of improvements made with the settlement money.

¶38. While abuse of a confidential relationship is one method of establishing a constructive trust, one may also be imposed where a party holds legal title to property that she ought not, in equity and good conscience, hold and enjoy. *Joel v. Joel*, 43 So. 3d 424, 431 (¶24) (Miss. 2010). This last method is the catch-all under which Nicole bases this argument.

¶39. Nicole spent her money improving the home and this fact is established in the record;[12] thus, "the sole question is whether the chancellor erred in not applying a constructive trust to the set of facts at hand." *Planters Bank & Tr. Co. v. Sklar*, 555 So. 2d

---

[12] Nicole produced various receipts to show that she invested about $5,000 in improvements to the home. Estella contested some of these expenses, but she was unable to produce any receipts of her own to show that she actually purchased the materials or services. Further, Estella did not testify or produce evidence about where the improvements to the home may have actually come from as evidenced by Nicole's photographs.

1024, 1034 (Miss. 1990). Thus, this issue is a question of law, so we review the chancellor's decision de novo. *Herron v. Herron*, 338 So. 3d 662, 668 (¶17) (Miss. Ct. App. 2022) (quoting *McNeil*, 753 So. 2d at 1064 (¶26)).

¶40.    Nicole cites *Herron*, a constructive trust and divorce case in which two people, Jesse and Lawanda were married. *Id*. at 664 (¶2). These two owned fifteen acres of property together. *Id*. Dorothy, a retired teacher, built a home on the fifteen acres with her own money at the urging of Jesse and Lawanda, who were concerned for her living situation at the time. *Id*. However, when Jesse and Lawanda divorced, both spouses included Dorothy's home as part of their marital estate. *Id*. at 664-65 (¶2). Dorothy then intervened in the divorce and requested that the court impose a constructive trust on the home and the land it sat on. *Id*. At trial, there was no dispute that Dorothy spent her money building the house, and there was no argument that either Jesse or Lawanda were in a confidential relationship with Dorothy. *Id*. at 665 (¶¶4-5). However, the trial court imposed a constructive trust on the land to benefit Dorothy based on equity and good conscience, finding that it would be unjust enrichment for either spouse to gain the house when Dorothy had invested her money into building the house. *Id*. at 666 (¶10).

¶41.    On appeal, Jesse argued that the trial court's ruling was wrong because no confidential relationship or abuse of confidence existed. *Id*. at 668 (¶17). This Court reiterated that abuse of confidence is simply one of many avenues through which a court may impose a constructive trust. *Id*. at (¶18) (citing *Joel*, 43 So. 3d at 431 (¶24)). Because Dorothy established that she had built the home with $100,000 of her own savings, that she paid all

19

the utilities and homeowner's insurance bills, and that Jesse never stayed in the house, owned a key for the house, or asserted control over it, our Court agreed that Jesse and Lawanda "ought in equity be required to convey [the home's title.]" *Id*. at 669 (¶20). Thus, we affirmed the trial court's finding that allowing either spouse to retain possession of the house after Dorothy invested her own money into building it would be unjust enrichment. *Id*.

¶42. Nicole relies on *Herron* to support her argument that despite no confidential relationship, allowing Estella to enjoy the benefits of Nicole's investments without Nicole receiving compensation is not equitable. However, *Herron* is distinguishable from the present case. In *Herron*, Dorothy invested all the money required to build the house; Jesse and Lawanda invested nothing into the home; and neither Jesse nor Lawanda lived in the home. *Id*. Dorothy also paid the insurance and utilities for the home. *Id*. at 665 (¶6). In the present case, Estella owned the home free and clear of debt, and Nicole only produced receipts showing that she invested roughly $5,000 into the home for repairs over a twenty-five-year period. No evidence in the record shows that Nicole has ever paid any rent, mortgage payments, taxes, or any other money toward the actual home itself. While Nicole said she paid for some of the utilities and groceries, she never produced receipts to prove this claim. Thus, the facts of *Herron* are not similar to the facts at hand, and it is inapplicable.

¶43. More applicable is *Tillman v. Mitchell*, 73 So. 3d 556, 560 (¶17) (Miss. Ct. App. 2011), where our Court held that Tillman was not entitled to a constructive trust on the theory of unjust enrichment. In that case, Tillman and his wife rented a house in Hattiesburg from his half-brother Mitchell. *Id*. at 557 (¶¶3-4). Eventually, Mitchell verbally offered Tillman

the option of purchasing the property by paying $300 a month for forty-eight months. *Id*. at

557 (¶5). Tillman began to pay Mitchell the $300 a month, but this agreement was not put

into writing at that time. *Id*. Mitchell later said that Tillman also verbally agreed to pay the

property taxes, keep the property clean, and purchase homeowner's insurance for the house.

*Id*. Tillman disputed these additional terms of the agreement. *Id*.

¶44. In July 2009, Mitchell filed to evict Tillman because of unpaid taxes and rent. *Id*. at

(¶7). Tillman in turn filed suit for a constructive trust. *Id*. At trial, Tillman argued that he

was entitled to a constructive trust or, in the alternative, a refund for the rent payments he

made to Mitchell under the theory of unjust enrichment. *Id*. at (¶9). The trial court refused

to impose a constructive trust and denied Tillman's request for a refund. *Id*. at (¶17).

¶45. On appeal, we affirmed the trial court's ruling, finding that Mitchell was not unjustly

enriched by the payments he received from Tillman because Tillman and his wife resided in

the house, for which they paid rent for the entirety of the agreement, but had not paid rent

since 2009. *Id*. Further, while Tillman had paid property taxes for one year, we stated that

"in light of other factors, we cannot find this sufficient to amount to unjust enrichment." *Id*.

As such, we found that it would actually be Tillman who would be unjustly enriched had the

trial court imposed a constructive trust because in effect "he [would be] allowed to live rent

free for the duration of the time Mitchell owned the house." *Id*.

¶46. We find the analysis in the present case is similar to that in *Tillman*. Nicole is the one

who would be unjustly enriched had the chancellor imposed a constructive trust. Nicole

would essentially receive a home to which she had no legal claim for the low price of $5,000,

after she has already lived in the home for nearly twenty-five years without evidence of any rent payments. Therefore, we find that the chancellor was correct in refusing to impose a constructive trust based on the theory that allowing Estella to retain ownership of the property would be against equity and good conscience.

## CONCLUSION

¶47. Nicole failed to establish that she and Estella were in a confidential relationship rather than simply a familial one. Although Nicole may have established that Estella promised to devise the home in her will, Nicole failed to prove that Estella ever promised or agreed to convey the home to Nicole during Estella's lifetime. Lastly, Nicole failed to establish that Estella would be unjustly enriched if the court failed to impose a constructive trust.[13] For all these reasons, we affirm the chancery court's final judgment.

¶48. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

---

[13] It can also be noted that, even were we to have found that a constructive trust was appropriate, the equitable solution would be to simply impose a constructive trust for the value that Nicole put into the home (roughly $5,000) not to order a transfer of the property. In the case of *Est. of Horrigan*, 757 So. 2d 165, 171 (¶27) (Miss. 1999), the supreme court found that a constructive trust should be imposed and can continue until the injured party was repaid the money they invested in the home plus interest.